IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:13-CV-772-D

| | |
|---|---|
| OMNISOURCE CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     **ORDER** |
| | ) |
| HEAT WAVE METAL PROCESSING, | ) |
| INC., | ) |
| Defendant. | ) |

On November 4, 2013, OmniSource Corporation ("OmniSource" or "plaintiff") sued Heat Wave Metal Processing, Incorporated ("Heat Wave" or "defendant"), alleging negligence and negligent hiring, training, and supervision. See Compl. [D.E. 1]. On December 4, 2013, Heat Wave answered the complaint and asserted several defenses, including contributory negligence [D.E. 10]. On June 5, 2014, OmniSource moved to amend its complaint to respond to Heat Wave's contributory negligence defense [D.E. 17]. On June 16, 2014, the court granted that motion [D.E. 19], and OmniSource filed an amended complaint [D.E. 20]. On July 3, 2014, Heat Wave answered the amended complaint [D.E. 21]. On October 19, 2014, OmniSource moved to strike the testimony of Heat Wave's expert witness, Hart C. Kerlin [D.E. 28], and filed a supporting memorandum [D.E. 28-1]. On October 24, 2014, Heat Wave moved for summary judgment [D.E. 29] and filed a supporting memorandum [D.E. 31]. On November 10, 2014, Heat Wave responded to OmniSource's motion to strike [D.E. 35]. On November 13, 2014, OmniSource responded to Heat Wave's motion for summary judgment [D.E. 36]. On November 26, 2014, Heat Wave replied to OmniSource's response to the motion for summary judgment [D.E. 37]. As explained below, the court denies OmniSource's motion to strike and grants in part Heat Wave's motion for summary judgment.

I.

A.

OmniSource is an Indiana corporation with its principal place of business in Indiana. Am.
Compl. [D.E. 20] ¶ 1. OmniSource "is a processor and distributor of scrap and secondary metals"
and has "facilities in multiple states, including North Carolina." Id. Heat Wave is a South Carolina
corporation that offers scrap metal processing services. Id. ¶ 2; Def.'s Answer Am. Compl. [D.E.
21] ¶ 2; Lowe Dep. [D.E. 31-6] 7 (deposition page 20). "Scrap metal processing" involves using a
torch to cut heavy metals, cleaning the cut metal, and sending it to a foundry or mill. See Lowe Dep.
[D.E. 31-6] 7–8 (deposition pages 20–22). Heat Wave typically performs its services on-site at a
client's plant or scrap yard. See id. 7–8 (deposition pages 21–22).

In February 2012, Heat Wave sent two of its employees, Danny Lowe and Phillip Starnes
("Lowe" and "Starnes," respectively), to a processing job at OmniSource's scrap yard in Smithfield,
North Carolina. Cf. id. 9 (deposition pages 28–29). The job for OmniSource was estimated to last
"roughly four to six weeks." Id. 9 (deposition page 29). As part of his employment with Heat Wave,
Lowe had worked with OmniSource at its Smithfield facility. Id. 9 (deposition pages 26–27). In
February 2012, Lowe was one of Heat Wave's "most experienced" torchers, having been with Heat
Wave for approximately fourteen years. Id. 6, 11 (deposition pages 15, 37). Starnes, however, had
only been a Heat Wave employee for "about a year." Id. 13 (deposition page 43); see Starnes Dep.
[D.E. 31-9] 5 (deposition page 11).

On March 7, 2012, "roughly three to five weeks" into the OmniSource job, Lowe and Starnes
were processing steel rotors in OmniSource's scrap yard. Lowe Dep. [D.E. 31-6] 9 (deposition page
29)); Lowe Dep. Part II [D.E. 31-7] 19 (deposition pages 180–81). Lowe and Starnes used ESAB
Oxweld 180 torches to cut the rotors. Lowe Dep. [D.E. 31-6] 16 (deposition page 57). Although

2

the rotors were mostly steel, they had manganese elements. See Lowe Dep. Part II [D.E. 31-7] 19 (deposition pages 180–81); [D.E. 31-14] 5. Lowe and Starnes were working in an area of the scrap yard known as the "bone yard." Zimmerman Dep. [D.E. 31-10] 8 (deposition page 24).

That afternoon, Ricky Zimmerman ("Zimmerman"), an OmniSource employee, assisted Lowe and Starnes by "cleaning the spread," which entails using a large machine with a grappling hook or magnet, known as a material handler, to either turn pieces of metal for cutting or move already-processed pieces aside. See Lowe Dep. [D.E. 31-6] 13 (deposition page 44); Lowe Dep. Part II [D.E. 31-7] 4 (deposition page 118); Zimmerman Dep. [D.E. 31-10] 8 (deposition pages 22–23). At all relevant times, the material handler was near where Lowe and Starnes were torching. See Lowe Dep. Part II [D.E. 31-7] 7 (deposition page 132); Zimmerman Dep. [D.E. 31-10] 19 (deposition pages 68–69).

After Zimmerman finished cleaning the spread, Zimmerman powered down the material handler. See Zimmerman Dep. [D.E. 31-10] 8, 28 (deposition pages 25, 104–05); Starnes Dep. [D.E. 31-9] 10 (deposition page 32); Def.'s Mem. Supp. Mot. Summ. J. [D.E. 31] 2; but see Lowe Dep. Part II [D.E. 31-7] 4–5 (deposition pages 121–22); Def.'s Answer Am. Compl. [D.E. 21] ¶¶ 7–8 (claiming the material handler was "left unattended and running"). Then, either Lowe or Starnes approached Zimmerman and asked about getting some water. See Lowe Dep. Part II [D.E. 31-7] 3 (deposition page 117); Zimmerman Dep. [D.E. 31-10] 8–9 (deposition pages 25–27). There are conflicting accounts of what happened next, but at some point Lowe and Starnes returned to work in the bone yard while Zimmerman remained in OmniSource's shop. Lowe Dep. Part II [D.E. 31-7] 8–10 (deposition pages 137–42); Zimmerman Dep. [D.E. 31-10] 20 (deposition pages 71–72).[1] The

---

[1] The disputed issues concerning what happened during the "water break" are not material. The parties also disagree about the timing of the break. Viewing the facts in the light most favorable

3

shop was located about 50 feet from the bone yard and had a large open "shop area" and a separate office space. Zimmerman Dep. [D.E. 31-10] 10 (deposition pages 32–33). There were two "big bay" doors in the shop area that opened out onto the bone yard. Id. 10 (deposition page 33).

When Lowe and Starnes resumed torching, Lowe was 15 to 20 feet from the material handler and Starnes was about 40 feet away from the material handler. See Davis 30(b)(6) Dep. [D.E. 31-2] 6, 9 (deposition pages 14, 27); Lowe Dep. Part II [D.E. 31-7] 2–3, 28 (deposition pages 113–14, 217); Zimmerman Dep. [D.E. 31-10] 19 (deposition pages 68–69). Lowe had his back towards the material handler and was torching in the opposite direction. Lowe Dep. [D.E. 31-6] 29 (deposition page 106). Lowe was the closest person to the material handler. Lowe Dep. Part II [D.E. 31-7] 12–13, 28 (deposition pages 153–54, 217). Lowe did not ask Zimmerman to move the material handler before resuming torching. See Zimmerman Dep. [D.E. 31-10] 19–20 (deposition pages 69–70).

Zimmerman was not aware that Lowe and Starnes had resumed and could not see them because he was in the office, which does not have a window or door to the bone yard. Zimmerman Dep. [D.E. 31-10] 13, 26 (deposition pages 42, 97); but see Stallings Dep. [D.E. 31-8] 8 (deposition page 23) (suggesting that Zimmerman was in the shop). Chris Stallings, OmniSource's maintenance supervisor, was aware that Lowe and Starnes had resumed torching and could see them from his place in the shop. Stallings Dep. [D.E. 31-8] 5–6, 8 (deposition pages 13–14, 23).

At some point after resuming torching, Lowe noticed, "out of the corner of [his] right eye," thick, black smoke coming from the material handler. Lowe Dep. [D.E. 31-6] 29 (deposition pages

_____

to OmniSource, the time-frame between when the material handler was powered down and when the material handler caught on fire could have been up to 50 minutes. See Lowe Dep. Part II [D.E. 31-7] 26–27 (deposition pages 209–10).

4

107–08); Lowe Dep. Part II [D.E. 31-7] 11 (deposition pages 146–47). Lowe then "cut [his] torch off, ran to the shop and told" someone about the smoke. Lowe Dep. Part II [D.E. 31-7] 11 (deposition pages 148–49). Starnes also ran to the shop to inform OmniSource employees about the fire. Starnes Dep. [D.E. 31-9] 8, 12 (deposition pages 25, 39). Less than a minute later, Lowe and Starnes returned to the bone yard and saw flames coming out of the material handler's engine compartment. Lowe Dep. Part II [D.E. 31-7] 11, 12 (deposition pages 148–49, 151); cf. Starnes Dep. [D.E. 31-9] 15 (deposition page 51) (noting the fire was "blazing" when they returned to the yard); but see Starnes Dep. [D.E. 31-9] 12, 14 (deposition pages 38, 47) (claiming that the material handler was "already on fire" when he first looked up and before he went into the shop). At that point, Lowe "went straight to the water cannon" and began spraying the material handler. Lowe Dep. Part II [D.E. 31-7] 12 (deposition page 150); Starnes Dep. [D.E. 31-9] 12 (deposition page 39). OmniSource employees also tried to extinguish the fire. See Stallings Dep. [D.E. 31-8] 6 (deposition pages 16–17); Lowe Dep. Part II [D.E. 31-7] 12 (deposition page 151). The fire department arrived "roughly 15 to 30 minutes" later. Lowe Dep. Part II [D.E. 31-7] 12 (deposition page 151). By that time, the fire was out or "pretty much out." Starnes Dep. [D.E. 31-9] 14 (deposition page 47).

The Smithfield Fire Department conducted a preliminary investigation and determined that the fire started in the engine compartment of the material handler, but concluded that the cause of the fire was undetermined. See Kerlin Initial Report [D.E. 28-11] 2; Kerlin Dep. [D.E. 28-12] 97 (deposition page 98).

## B.

March 7, 2012, was a windy day. See Starnes Dep. [D.E. 31-9] 12, 19–20 (deposition pages 40–41, 69–70) (noting that it was "pretty windy that day"); but see Lowe Dep. Part II [D.E. 31-7] 11 (deposition page 146) (noting that there was "very little wind"). That afternoon, "the wind gusted

5

from the area of [Lowe's] torching towards the material handler with speeds of up to 18 miles per hour." Def.'s Mem. Supp. Mot. Summ. J. [D.E. 31] 3; but see Lowe Dep. Part II [D.E. 31-7] 11 (deposition page 146) (claiming that the wind was "coming from [his] back").

The material handler at issue was a 2009 Caterpillar model. Zimmerman Dep. [D.E. 31-10] 6 (deposition page 16). That particular model was equipped with warnings and alarms that alert when there are certain problems with the machine, such as overheating and low oil. Id. 23 (deposition pages 84–85); Stallings Dep. [D.E. 31-8] 10 (deposition page 30). On March 7, 2012, no alarms or warnings went off. See Zimmerman Dep. [D.E. 31-10] 23, 25 (deposition pages 85, 93). Zimmerman testified that he inspected the material handler on the morning of March 7, 2012, and noted no problems with it. Id. 21–22 (deposition pages 77, 79–80). In February 2012, Caterpillar representatives had inspected the material handler and performed routine, preventive maintenance work on it. Stallings Dep. [D.E. 31-8] 11–12 (deposition pages 34–39).

OmniSource fired Zimmerman shortly after the March 7, 2012 incident. See Zimmerman Dep. [D.E. 31-10] 17 (deposition pages 59–60). Zimmerman believed OmniSource fired him because OmniSource blamed him for the fire. See id.; cf. [D.E. 31-15] 7 (in a presentation prepared by OmniSource's Safety Director regarding the incident, OmniSource noted that one of the "root causes" of the incident was that "[o]ur operator left the material handler too close to the hot work area . . . . [and] [o]perator was out-of-sight of the equipment").

## C.

The court notes the following pertinent facts concerning scrap metal processing. When cut, manganese produces a larger amount of sparks and "slag" than other heavy metals. See Lowe Dep. Part II [D.E. 31-7] 19 (deposition page 181); Starnes Dep. [D.E. 31-9] 18 (deposition page 64). "[M]etal pieces that have just recently been processed or cut by a torcher remain extremely hot for

6

a period of time." Danny Lowe Decl. [D.E. 31-12] ¶ 5; Amy Lowe Decl. [D.E. 31-13] ¶ 7; see Starnes Dep. [D.E. 31-9] 24 (deposition pages 87–88). It is not uncommon for "sparks or 'slag' [to] fall off of, or become separated from, recently processed or cut pieces of metal when picked up and moved" by a material handler or when cleaning the spread. Danny Lowe Decl. [D.E. 31-12] ¶¶ 7–8; Amy Lowe Decl. [D.E. 31-13] ¶¶ 9–10.

Sparks can disseminate in all directions during torching. Lowe Dep. [D.E. 31-6] 18 (deposition pages 63–64). Although the angle of the torch helps control the dispersion of sparks, sparks can fly in the opposite direction and land behind a torcher. See id.; Lowe Dep. Part II [D.E. 31-7] 3 (deposition pages 115–16); Starnes Dep. [D.E. 31-9] 9, 18 (deposition pages 28–29, 63); Amy Lowe Dep. [D.E. 31-5] 27 (deposition pages 99–100). In windy conditions, sparks can blow in the direction of the wind. See Starnes Dep. [D.E. 31-9] 19 (deposition pages 68–69); cf. Amy Lowe Dep. [D.E. 31-5] 38 (deposition page 142).

During torching, sparks can fly a significant distance. See, e.g., Starnes Dep. [D.E. 31-9] 11 (deposition page 37). The national standard for fire prevention calls for at least 35 feet of clearance between a torcher and any combustible material. See NFPA Standard [D.E. 36-7] 5–6.[2] OmniSource's training materials, which were provided to Heat Wave, adhered to the "35-foot" policy. See [D.E. 36-8] 4; Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. [D.E. 36] 7–8. Heat Wave's company policy prohibited torching operations within 25 feet of combustible material. See Amy Lowe Dep. [D.E. 31-5] 26–27, 37 (deposition pages 97–99, 140). A material handler is considered a "combustible material." See Stallings Dep. [D.E. 31-8] 10–11 (deposition pages 32–34); Lowe Dep. Part II [D.E. 31-7] 18 (deposition pages 174–75); Amy Lowe Dep. [D.E. 31-5] 32 (deposition

---

[2] The parties agree that, given Lowe's distance from the material handler, it was "possible for his sparks to reach the material handler." Def.'s Mem. Supp. Mot. Summ. J. [D.E. 31] 3.

pages 118–19); Kerlin Dep. [D.E. 28-12] 126 (deposition page 127).

## II.

OmniSource seeks to exclude the initial report and testimony of Hart C. Kerlin ("Kerlin"), Heat Wave's expert, as irrelevant and unreliable. See Mot. Strike Kerlin [D.E. 28]; Pl.'s Mem. Supp. Mot. Strike Kerlin [D.E. 28-1] 17–24.[3] In addition, OmniSource contends that Kerlin's supplemental report is untimely, irrelevant, and improper, and asks that it be stricken. See Pl.'s Mem. Supp. Mot. Strike Kerlin [D.E. 28-1] 24–29. As an alternative to exclusion, OmniSource seeks sanctions against Heat Wave, including having Heat Wave bear OmniSource's "costs and fees" for any necessary supplemental depositions and for the "retention and presentation of an OmniSource rebuttal expert." Id. 29.

Rule 702 of the Federal Rules of Evidence governs the admission of expert testimony. See Fed. R. Evid. 702. Rule 702 provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Rule 702 "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993). "Rule 702 was intended to liberalize the introduction of relevant expert evidence," but "expert witnesses have the potential to be both powerful and quite

---

[3] OmniSource does not argue that Kerlin is unqualified to serve as a "fire origin expert." Pl.'s Mem. Supp. Mot. Strike Kerlin [D.E. 28-1] 1 n.1.

misleading." Cooper v. Smith & Nephew, Inc., 259 F.3d 194, 199 (4th Cir. 2001) (quotations omitted).

The proponent of the expert testimony must establish its admissibility by a preponderance of the evidence. Id. A district court has broad latitude in determining whether to admit proposed expert testimony. See, e.g., United States v. Gastiaburo, 16 F.3d 582, 589 (4th Cir. 1994); Silicon Knights, Inc. v. Epic Games, Inc., No. 5:07-CV-275-D, 2011 WL 6748518, at *5 (E.D.N.C. Dec. 22, 2011) (unpublished).

Courts have distilled Rule 702's requirements into two crucial inquiries: whether the proposed expert testimony is relevant and whether it is reliable. Kumho Tire Co. v. Carmichael, 526 U.S. 137, 141 (1999); Daubert, 509 U.S. at 589; United States v. Forrest, 429 F.3d 73, 80 (4th Cir. 2005). The trial court must perform its special gatekeeping obligation of ensuring that expert testimony meets both requirements. See, e.g., Kumho Tire, 526 U.S. at 147.

To be relevant, the proposed expert testimony must be helpful to the trier of fact. See Daubert, 509 U.S. at 591–92. "Testimony from an expert is presumed to be helpful unless it concerns matters within the everyday knowledge and experience of a lay juror." Kopf v. Skyrm, 993 F.2d 374, 377 (4th Cir. 1993). The relevancy requirement has been described as a question of "fit," and demands that "'expert testimony proffered in the case [be] sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.'" Daubert, 509 U.S. at 591 (quoting United States v. Downing, 753 F.2d 1224, 1242 (3d Cir. 1985)). To be relevant, proffered expert testimony must only "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702; see Daubert, 509 U.S. at 591–92. Rule 702 does not require that "proffered expert testimony [be] irrefutable or certainly correct." Silicon Knights, Inc. v. Epic Games, Inc., No. 5:07-CV-275-D, 2011 WL 5151345, at *3 (E.D.N.C. Oct. 28, 2011) (unpublished).

9

"[T]he test of reliability is flexible and the law grants a district court the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." United States v. Wilson, 484 F.3d 267, 274 (4th Cir. 2007) (quotations omitted); see Kumho Tire, 526 U.S. at 141–42. "In making its initial determination of whether proffered testimony is sufficiently reliable, the court has broad latitude to consider whatever factors bearing on validity that the court finds to be useful; the particular factors will depend upon the unique circumstances of the expert testimony involved." Westberry v. Gislaved Gummi AB, 178 F.3d 257, 261 (4th Cir. 1999). In analyzing reliability, a court should consider factors such as:

(1) whether a theory or technique can be or has been tested; (2) whether it has been subjected to peer review and publication; (3) whether a technique has a high known or potential rate of error and whether there are standards controlling its operation; and (4) whether the theory or technique enjoys general acceptance within a relevant scientific community.

Cooper, 259 F.3d at 199; see Daubert, 509 U.S. at 592–94; Silicon Knights, Inc., 2011 WL 6748518, at *6.

A.

The court first considers OmniSource's arguments that the court should exclude Kerlin's initial report and testimony. With respect to this evidence, OmniSource questions both its relevance and reliability.

OmniSource first contends that Kerlin's proposed testimony offers "no assistance to the trier of fact" because his "proposed opinions are non-opinions [and] he has done no meaningful investigation into the cause of the fire, but he offers criticisms of those who undertook to investigate it before him." Pl.'s Mem. Supp. Mot. Strike Kerlin [D.E. 28-1] 17. Omnisource also questions the "fit" between Kerlin's testimony and the facts of this case and argues that Kerlin's testimony is not based upon sufficient facts or data. See id. 18–19. Lastly, OmniSource claims that Kerlin's

10

proposed testimony is harmful, rather than helpful, to the trier of fact because it "invades the province of the jury, as an expert offering an untested and unsupported opinion that inferences to be made from the evidence are not viable." Id. 18.

The court disagrees with OmniSource and finds Kerlin's proposed testimony relevant. Because the plaintiff bears the ultimate burden of proof, a defense expert is not required to put forth a definitive opinion on causation in order to be helpful to the trier of fact. See, e.g., Wilder v. Eberhart, 977 F.2d 673, 675–77 (1st Cir. 1992) ("Defendant need not prove another cause, he only has to convince the trier of fact that the alleged negligence was not the legal cause of the injury. In proving such a case, a defendant may produce other 'possible' causes of the plaintiff's injury." (citations omitted)); Kechi Twp. v. Freightliner, LLC, No. 6:10-cv-1051-MLB, 2011 WL 6845799, at *2 (D. Kan. Dec. 29, 2011) (unpublished); Nationwide Mut. Ins. Co. v. Nat'l RV Holdings, Inc., No. 1:05-CV-2509, 2007 WL 954258, at *6 (M.D. Pa. Mar. 28, 2007) (unpublished); see also Westberry, 178 F.3d at 265–66.

Although Kerlin did not offer a definitive opinion on what caused the fire in his initial report and deposition, he did outline several possible causes and determined that, at that time, none of the possibilities could "be completely eliminated . . . . [thus] the cause of fire remains undetermined." Kerlin Initial Report [D.E. 28-11] 3. OmniSource notes that Kerlin's initial report is more accurately characterized as an expert critique of prior investigations than an expert opinion on causation. See id. 2 ("There were multiple potential ignition scenarios that should have been considered in this incident."); Kerlin Dep. [D.E. 28-12] 96–113 (deposition pages 97–114). OmniSource, however, fails to explain why such testimony is improper or irrelevant. Moreover, contrary to OmniSource's assertion, Kerlin did offer an opinion in his initial report and deposition—namely, that OmniSource's evidence of causation was flawed because OmniSource had not eliminated the other "potential

11

ignition scenarios" through a proper investigation. Kerlin Initial Report [D.E. 28-11] 2–3; see Kerlin Dep. [D.E. 28-12] 99–100 (deposition pages 100–01).

Kerlin's opinion goes to the heart of OmniSource's case and will assist the trier of fact in understanding the evidence and deciding whether OmniSource has met its burden of proof on causation. See Fed. R. Evid. 702(a); Harris v. Patel, No. 8:01-CV-1421-DKC, 2002 WL 34700319, at *2–3 (D. Md. Nov. 18, 2002) (unpublished) (allowing defendant's experts to testify that causation could not be determined to a reasonable degree of medical certainty and about other "possible causes" not advanced by the plaintiff); Shreve v. Sears, Roebuck & Co., 166 F. Supp. 2d 378, 409 n.20 (D. Md. 2001) (noting that there should be "little concern" under Rule 702 about allowing experts to offer opinion testimony with regard to alternate causal possibilities "so long as testimony as to the 'possibilities' is rooted in something other than 'surmise, conjecture, and speculation'"). Although an equivocal opinion by a plaintiff's expert (where the plaintiff has the burden of proof) can be considered irrelevant, see, e.g., Pipitone v. Biomatrix, Inc., 288 F.3d 239, 245 (5th Cir. 2002), a defense expert's opinion plays a different role and is relevant to the extent it undercuts the plaintiff's proof of causation. Moreover, Kerlin's "possibilities," although untested, are based on more than surmise, conjecture, or speculation. They are based on Kerlin's review and research of documents and data concerning this case and his specialized knowledge of fire origins. See Kerlin Initial Report [D.E. 28-11] 1, 3. Simply put, Kerlin's opinions regarding fire causation and proper investigation are outside the everyday knowledge and experience of a lay juror and are relevant to the factual issues before the jury.

To the extent Kerlin's opinions contradict other relevant testimony, the "power to resolve any conflicts . . . between the [parties'] evidence . . . [is] peculiarly in the province of the jury." Balt. & Ohio R.R. Co. v. Deneen, 167 F.2d 799, 801 (4th Cir. 1948); see Kopf, 993 F.2d at 377. At trial,

the jury can weigh all relevant evidence, determine witness credibility, and decide how much weight, if any, to afford Kerlin's testimony.

The court also rejects OmniSource's "fit" argument. OmniSource contends that Kerlin's opinions do not rely on sufficient facts or data connected to this case because he has not independently investigated the matter. OmniSource, however, cites no support for the proposition that Kerlin "cannot critique the investigations of others when he himself has not fully investigated the matter himself." Pl.'s Mem. Supp. Mot. Strike Kerlin [D.E. 28-1] 18. Moreover, experts are allowed to base their opinions on "facts or data in the case that the expert has been made aware of," if such information is a type reasonably relied upon by experts in the field. See Fed. R. Evid. 703. Individual investigation is not necessarily required. See id.; Nat'l RV Holdings, 2007 WL 954258, at *5. Kerlin reasonably relied upon the records of the case, all of which contained facts and data concerning this incident. See Kerlin Initial Report [D.E. 28-11] 1. Ultimately, OmniSource's concerns go to the weight of Kerlin's testimony and not to its admissibility. See Bonner v. ISP Techs., Inc., 259 F.3d 924, 929–30 (8th Cir. 2001); Glen Falls Ins. Co. v. Cher-Chris Constr. Co., No. 1:04-1390-WDQ, 2005 WL 5994153, at *3 (D. Md. July 22, 2005) (unpublished). OmniSource can cross-examine Kerlin at trial about the depth of his investigation, and the jury will decide how much weight to afford Kerlin's testimony.

Lastly, the court does not agree that Kerlin's proposed testimony impermissibly invades the province of the jury. Unlike lay witnesses, expert witnesses are allowed to offer opinions, which a jury is free to accept or reject. See Fed. R. Evid. 702. Just as an expert offering an opinion on the specific cause of an accident would not invade the province of a jury, Kerlin's opinions about the adequacy of the investigations and alternative causes do not impermissibly invade the province of the jury. The jury is free to weigh the conflicting evidence in determining whether OmniSource has

13

met its burden of proof on causation.

OmniSource next claims that Kerlin's testimony is unreliable. See Pl.'s Mem. Supp. Mot. Strike Kerlin [D.E. 28-1] 20–24. OmniSource claims that "Daubert requires that a fire origin expert's opinion as to the specific cause of the fire must be grounded in the methods and procedures of science." Id. 20 (quotation omitted). OmniSource's argument, however, fatally fails to recognize that Kerlin never attempted or pretended to identify a specific cause of the fire. Kerlin's report identifies possible causes of the fire, but Kerlin never attempts to advance any particular theory as an actual cause. Moreover, because Kerlin never tested or advanced a specific theory of causation, he was not required to use the scientific method.[4]

Kerlin's testimony addresses only the adequacy of prior investigations and expresses, to a "reasonable degree of professional certainty," that the available evidence was not sufficient to support a causal inference of any type. See Kerlin Initial Report [D.E. 28-11] 3; Kerlin Dep. [D.E. 28-12] 99–100 (deposition pages 100–01). Such expert testimony is proper. See, e.g., Kechi Twp., 2011 WL 6845799, at *2; Harris, 2002 WL 34700319, at *2–3. Notably, in forming his opinions, Kerlin relied on NFPA 921, which courts "have uniformly found" to be a reliable reference on proper fire investigation. Nat'l RV Holdings, 2007 WL 954258, at *4 (collecting cases); see Def.'s Resp. Pl.'s Mot. Strike Kerlin [D.E. 35] 10. The court finds Kerlin's review of the evidence in light of NFPA standards, coupled with his expertise in fire origins and experience as a fire investigator, to

---

[4] To the extent OmniSource claims that Kerlin admits that he did not apply the scientific method in forming his opinions, see Pl.'s Mem. Supp. Mot. Strike Kerlin [D.E. 28-1] 9, 20, OmniSource misreads the report and mischaracterizes Kerlin's deposition testimony. See Kerlin Initial Report [D.E. 28-11] 2 (explaining that other entities did not use the scientific method when conducting their investigations); Kerlin Dep. [D.E. 28-12] 96–99 (deposition pages 97–100) (explaining his opinion that the cause of the cannot be determined because a proper investigation according to scientific method has not been performed by any party, including himself).

14

be sufficiently reliable bases for his opinions. See, e.g., Nat'l RV Holdings, 2007 WL 954258, at
*6. Thus, the court denies OmniSource's motion to exclude Kerlin's proposed testimony.

B.

OmniSource next contends that Kerlin's supplemental report is not a proper supplement and

thus that it is untimely under this court's scheduling order [D.E. 13] and the Federal Rules of Civil

Procedure. OmniSource claims that Kerlin's supplemental report improperly offers "entirely new

opinions." Pl.'s Mem. Supp. Mot. Strike Kerlin [D.E. 28-1] 25. Heat Wave responds that Kerlin's

supplement is proper in light of "new information gathered through subsequent discovery." Def.'s

Resp. Mot. Strike Kerlin [D.E. 35] 16.

Under Rule 26(a) of the Federal Rules of Civil Procedure, "[t]he parties must supplement

[their expert] disclosures when required under Rule 26(e)." Fed. R. Civ. P. 26(a)(2)(E). According

to Rule 26(e),

> A party who has made a disclosure under Rule 26(a) . . . must supplement or correct
> its disclosure or response . . . in a timely manner if the party learns that in some
> material respect the disclosure or response is incomplete or incorrect, and if the
> additional or corrective information has not otherwise been made known to the other
> parties during the discovery process . . . .

Fed. R. Civ. P. 26(e)(1). Further,

> For an expert whose report must be disclosed under Rule 26(a)(2)(B), the party's
> duty to supplement extends both to information included in the report and to
> information given during the expert's deposition. Any additions or changes to this
> information must be disclosed by the time the party's pretrial disclosures under Rule
> 26(a)(3) are due.

Fed. R. Civ. P. 26(e)(2).

Supplementation of an expert report permits a party to correct inadvertent errors or

omissions. Supplementation, however, is not a license to amend an expert report to support a

party's position on summary judgment. See, e.g., Gallagher v. S. Source Packaging, LLC, 568 F.

15

Supp. 2d 624, 630–31 (E.D.N.C. 2008). Courts distinguish "true supplementation" (e.g., correcting inadvertent errors or omissions) from gamesmanship, and have therefore repeatedly rejected attempts by parties to bolster their position at summary judgment by "supplementing" an expert report with a "new and improved" expert report. See, e.g., MicroStrategy, Inc. v. Bus. Objects, S.A., 429 F.3d 1344, 1353 (Fed. Cir. 2005); Solaia Tech. LLC v. ArvinMeritor, Inc., 361 F. Supp. 2d 797, 806 (N.D. Ill. 2005) ("It would appear that [the expert's] much expanded opinion was prompted solely by [the] summary judgment motion . . . . This is not the proper role for supplementation of a report by an expert."); Beller ex rel. Beller v. United States, 221 F.R.D. 696, 701 (D.N.M. 2003) ("To rule otherwise would create a system where preliminary reports could be followed by supplementary reports and there would be no finality to expert reports, as each side, in order to buttress its case or position, could 'supplement' existing reports and modify opinions previously given."); Akeva L.L.C. v. Mizuno Corp., 212 F.R.D. 306, 310 (M.D.N.C. 2002) ("To construe supplementation to apply whenever a party wants to bolster or submit additional expert opinions would [wreak] havoc [on] docket control and amount to unlimited expert opinion preparation."). However, supplemental reports may be necessary and proper when new information is obtained. See, e.g., EEOC v. Freeman, 961 F. Supp. 2d 783, 797 (D. Md. 2013); Wilson v. Sundstrand Corp., No. 1:99-cv-6944, 2003 WL 22012673, at *7–8 (N.D. Ill. Aug. 25, 2003) (unpublished); Collier v. Bradley Univ., 113 F. Supp. 2d 1235, 1242 (C.D. Ill. 2000).

Heat Wave's supplement is proper because it is based on new information. Kerlin's initial report is dated July 22, 2014. Kerlin Initial Report [D.E. 28-11] 1. Kerlin was deposed on September 18, 2014. Kerlin Dep. [D.E. 28-12] 1. Between August 18, 2014, and September 30, 2014, Kerlin received additional discovery concerning this case, including the deposition transcripts of key witnesses. See Kerlin Decl. [D.E. 35-2] ¶¶ 5–8. From this new information, Kerlin learned

16

facts previously unknown to him, which allowed him to set certain controls and variables for testing. See Kerlin Decl. [D.E. 35-2] ¶¶ 9–12. In light of the substantial amount of new information that Kerlin received after his initial report and because Kerlin relied on some of this new information when formulating his supplemental opinions, the supplemental report [D.E. 28-19] is a true supplement. See, e.g., S. States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 595–96 (4th Cir. 2003) ("Rule 26(e)(1) requires a party to supplement its experts' reports and deposition testimony when the party learns of new information."); Everlight Elecs., Co. v. Nichia Corp., No. 12-CV-11758, 2014 WL 3925276, at *2–4 (E.D. Mich. Aug. 12, 2014) (unpublished).

Alternatively, the court finds that exclusion of the supplemental report is not an appropriate remedy because any error in permitting the supplement can be cured. See Fed. R. Civ. P. 37(c)(1); S. States Rack & Fixture, Inc., 318 F.3d at 596–97. Specifically, OmniSource will be given a second opportunity to depose Kerlin and to have its expert respond. Thus, to the extent OmniSource seeks to strike Kerlin's supplemental report, the motion is denied.

As a proper supplement, Heat Wave's disclosure was timely. Rule 26 requires supplemental reports by experts to be "disclosed by the time the party's pretrial disclosures under Rule 26(a)(3) are due." Fed. R. Civ. P. 26(e)(2). According to this court's scheduling order, Rule 26(a)(3) disclosures are not due in this case until "twenty days before the final pretrial conference." See [D.E. 13]. Because the final pretrial conference has not yet been scheduled, Heat Wave's supplement is timely under the Federal Rules of Civil Procedure and this court's scheduling order. Thus, the court denies OmniSource's motion for sanctions and costs related to additional discovery. However, the court will reopen the discovery period to allow OmniSource to depose Kerlin concerning the supplement. Within 30 days of Kerlin's supplemental deposition, OmniSource may submit a rebuttal expert report. If OmniSource chooses to retain a rebuttal expert, Heat Wave will then be allowed

17

to depose that expert. Each party shall bear its own costs.

## III.

Next, the court considers Heat Wave's motion for summary judgment [D.E. 29]. Summary judgment is appropriate when, after reviewing the record taken as a whole, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986). The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the nonmoving party may not rest on the allegations or denials in its pleading, Anderson, 477 U.S. at 248–49, but "must come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (emphasis removed) (quotation omitted). A trial court reviewing a motion for summary judgment should determine whether a genuine issue of material fact exists for trial. Anderson, 477 U.S. at 249. In making this determination, the court must view the evidence and the inferences drawn therefrom in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007).

The court has jurisdiction based on diversity, and North Carolina law governs plaintiff's claims. Thus, this court must determine how the Supreme Court of North Carolina would rule. See, e.g., Twin City Fire Ins. Co. v. Ben Arnold-Sunbelt Beverage Co. of S.C., 433 F.3d 365, 369 (4th Cir. 2005). "If the Supreme Court of [North] Carolina has spoken neither directly or indirectly on the particular issue before us, [this court is] called upon to predict how that court would rule if presented with the issue." Id. (quotation omitted). In making that prediction, the court may consider opinions of the North Carolina Court of Appeals, treatises, and the practices of other states. Id.

18

A.

OmniSource's first claim alleges Heat Wave's negligence on March 7, 2012. Am. Compl. [D.E. 20] ¶¶ 12–16.[5] To prove negligence, a plaintiff must show "(1) a legal duty; (2) a breach thereof; and (3) injury proximately caused by the breach." Bridges v. Parrish, 366 N.C. 539, 541, 742 S.E.2d 794, 796 (2013) (quotation omitted). In support of its motion for summary judgment on this claim, Heat Wave argues only that OmniSource's evidence on causation is insufficient as a matter of law. See Def.'s Mem. Supp. Mot. Summ. J. [D.E. 31] 6–13.

"Summary judgment generally is disfavored in cases of negligence or contributory negligence." Thompson v. Bradley, 142 N.C. App. 636, 641, 544 S.E.2d 258, 261 (2001); see Lane v. Dorney, 252 N.C. 90, 93, 113 S.E.2d 33, 35 (1960); Lavelle v. Schultz, 120 N.C. App. 857, 859, 463 S.E.2d 567, 569 (1995). In order to survive a motion for summary judgment and "go to the jury on the question of defendant's negligence causing the fire, plaintiffs must not only show that the fire might have been started due to the defendant's negligence, but must show by reasonable affirmative evidence that it did so originate." Phelps v. City of Winston-Salem, 272 N.C. 24, 31, 157 S.E.2d 719, 724 (1967). Plaintiffs can satisfy this burden with either direct or circumstantial evidence. Id. at 31, 157 S.E.2d at 724; J.S. Moore & Co. v. Atl. Coast Line R.R. Co., 173 N.C. 311, 92 S.E. 1, 2 (1917).

_____

[5] In count one, OmniSource also alleges that Heat Wave acted with "gross negligence," recklessness, and willful and wanton conduct. Am Compl. [D.E. 20] ¶¶ 15–16. Because such claims require a plaintiff to prove the standard elements of negligence and because Heat Wave does not seek summary judgment on the claims for gross negligence "[e]xcept insofar as its proximate cause argument . . . addresses all claims," Def.'s Mem. Supp. Mot. Summ. J. [D.E. 31] 16 n.2, the court incorporates these claims in its discussion in section III. A. As explained below, however, to the extent OmniSource seeks punitive damages based on any alleged "willful or wanton" conduct by Heat Wave, the court grants summary judgment to Heat Wave.

19

Given that Heat Wave employees were spraying fire within 20 feet of OmniSource's machine and that, given the wind's speed and direction, sparks were flying in the direction of the machine immediately before the machine caught on fire, there is reasonable affirmative evidence connecting the fire to Heat Wave's conduct. See, e.g., Patton v. Dail, 252 N.C. 425, 429–30, 114 S.E.2d 87, 90–91 (1960); Simmons v. John L. Roper Lumber Co., 174 N.C. 220, 93 S.E. 736, 738 (1917); cf. Moore, 173 N.C. 311, 92 S.E. at 2 (plaintiff's case not sufficient to go to the jury "in the absence of any evidence that the [defendant was] emitting sparks at the time" it passed plaintiff's property); Maguire v. Seaboard Air Line Ry., 154 N.C. 384, 70 S.E. 737, 738–39 (1911) (finding that plaintiff had not made a sufficient showing of causation because there was no evidence that the defendant emitted sparks or about the "character and direction of the wind"). There is a genuine issue of material fact as to causation and there is sufficient circumstantial evidence of causation that a reasonable jury could find that Heat Wave's negligence caused the fire.[6] Thus, the court denies Heat Wave's motion for summary judgment on OmniSource's negligence claim.

Heat Wave also argues that OmniSource was negligent in leaving the material handler "unattended in proximity to the torching area." Def.'s Mem. Supp. Mot. Summ. J. [D.E. 31] 17. In so doing, Heat Wave claims OmniSource ignored unreasonable risks for its own safety and that this failure should bar OmniSource's recovery under the doctrine of contributory negligence. See Def.'s Answer Am. Compl. [D.E. 21] 4–5; Def.'s Mem. Supp. Mot. Summ. J. [D.E. 31] 16–20.

---

[6] The court has considered the cases that Heat Wave cites in support of its motion for summary judgment but finds them distinguishable. Here, Heat Wave was intentionally spraying fire. Thus, this case cannot be likened to the cited cases because in those cases there was no evidence linking the defendant to a fire source. See, e.g., Phelps, 272 N.C. at 31, 157 S.E.2d at 724; Maharias v. Weathers Bros. Moving & Storage Co., 257 N.C. 767, 767–68, 127 S.E.2d 548, 549 (1962) (per curiam); Pine State Yarn Mills, Inc. v. Troutman Foundry, Inc., 8 N.C. App. 521, 522–23, 174 S.E.2d 706, 707–08 (1970); see also Collins v. Caldwell Furniture Co., 16 N.C. App. 690, 696, 193 S.E.2d 284, 288 (1972).

20

"A plaintiff is contributorily negligent when he fails to exercise such care as an ordinarily prudent person would exercise under the circumstances in order to avoid injury." Newton v. New Hanover Cnty. Bd. of Educ., 342 N.C. 554, 564, 467 S.E.2d 58, 65 (1996), abrogated on other grounds by Nelson v. Freeland, 349 N.C. 615, 507 S.E.2d 882 (1998); see Nicholson v. Am. Safety Util. Corp., 346 N.C. 767, 772, 488 S.E.2d 240, 244 (1997). Although summary judgment is "rarely appropriate" in cases involving contributory negligence, summary judgment may be properly granted "where the evidence establishes the plaintiff's own negligence so clearly that no other reasonable conclusion may be reached." Nicholson, 346 N.C. at 774, 488 S.E.2d at 244; see Kelly v. Regency Ctrs. Corp., 203 N.C. App. 339, 342, 691 S.E.2d 92, 95 (2010). Viewing the evidence in the light most favorable to OmniSource, a genuine issue of material fact exists concerning whether OmniSource was contributorily negligent concerning the fire and whether any negligence on the part of OmniSource was a proximate cause of the injury. Thus, to the extent Heat Wave asks the court to grant summary judgment on its contributory negligence defense, the court denies the motion.

As for Heat Wave's motion for summary judgment on OmniSource's "last clear chance" rebuttal to Heat Wave's contributory negligence defense, the court denies the motion for summary judgment. Because this court cannot determine as a matter of law whether OmniSource was contributorily negligent, it also cannot evaluate the merits of the last clear chance doctrine at this time. See, e.g., Geiger v. Guilford Coll. Cmty. Volunteer Firemen's Ass'n, Inc., 668 F. Supp. 492, 498 (M.D.N.C. 1987). The court will reconsider the matter at trial.[7]

_____

[7] North Carolina precedent concerning the last clear chance doctrine is generally postured on appeal either in a discussion of whether there was sufficient evidence to submit the issue to a jury or in a discussion of whether a trial court properly granted summary judgment or judgment as a matter of law to a defendant in light of plaintiff's evidence showing that the defendant had the last clear chance to avoid the injury. Because the court denies Heat Wave's motion for summary judgment on negligence and contributory negligence, the court need not consider the last clear

21

Case 5:13-cv-00772-D  Document 39  Filed 05/29/15  Page 21 of 24

B.

OmniSource's second claim alleges that Heat Wave negligently hired, trained, and supervised its employees. Am. Compl. [D.E. 20] ¶¶ 17–23. In order to prove a claim for negligent hiring, training, or supervision, a plaintiff must prove:

> (1) the specific negligent act on which the action is founded . . . (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; and (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in 'oversight and supervision,' . . .; and (4) that the injury complained of resulted from the incompetency proved.

Medlin v. Bass, 327 N.C. 587, 591, 398 S.E.2d 460, 462 (1990) (quotation omitted); Moricle v. Pilkington, 120 N.C. App. 383, 386, 462 S.E.2d 531, 533 (1995). Viewing the evidence in the light most favorable to OmniSource, there is not sufficient evidence of either innate incompetence or of specific acts of prior negligence for a reasonable jury to find that either Lowe or Starnes was inherently unfit. To the extent OmniSource argues that Heat Wave employees were inherently unfit because they were trained under a "25-foot" rule rather than a "35-foot rule," the court rejects the argument. Whatever "incompetence" could be said to have resulted from this 10-foot deficit in

---

chance doctrine at this time.

    To the extent Heat Wave argues that the last clear chance doctrine cannot apply in this case because this case does not involve automobiles, see Def.'s Answer Am. Compl. [D.E. 21] 5, the court rejects the argument. Although the last clear chance doctrine often arises in automobile accident cases, the Supreme Court of North Carolina recognized the doctrine long before Henry Ford popularized the modern automobile. See, e.g., Gunter v. Wicker, 85 N.C. 310, 312 (1881) (applying the doctrine in a case involving a steam saw mill); Doggett v. Richmond & Danville R.R., 78 N.C. 305, 307 (1878) (per curiam). Moreover, the elements of the doctrine do not limit its applicability and the court sees no reason why the Supreme Court of North Carolina would so limit the doctrine's application. See, e.g., Battle v. S. Ry., 223 N.C. 395, 395–96, 26 S.E.2d 859, 859 (1943) (per curiam) (considering applying the last clear chance doctrine in a case involving railroad accident). After all, the Supreme Court of North Carolina has said that "[i]n this jurisdiction last clear chance is but an application of the doctrine of proximate cause." Vernon v. Crist, 291 N.C. 646, 654, 231 S.E.2d 591, 596 (1977) (quotation omitted).

22

training cannot be a proximate cause of the instant injury because the evidence shows that Lowe was within 25 feet of the material handler. Thus, there is no genuine issue of material fact concerning whether the alleged 10-foot deficiency in training resulted in OmniSource's injury. Accordingly, the court grants summary judgment to Heat Wave on OmniSource's negligent hiring, training, and supervision claim.

C.

To the extent OmniSource seeks punitive damages, see Am. Compl. [D.E. 20] 6, the court grants Heat Wave's motion for summary judgment. Under North Carolina law, punitive damages can only be awarded in cases involving the aggravating factors of fraud, malice, or willful or wanton conduct. N.C. Gen. Stat. § 1D-15(a). Moreover, "[p]unitive damages shall not be awarded against a person solely on the basis of vicarious liability for the acts or omissions of another." N.C. Gen. Stat. § 1D-15(c). Accordingly, in a case against a corporation, punitive damages may only be awarded if "the officers, directors, or managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages." Id.

To the extent OmniSource bases its request for punitive damages on Heat Wave's corporate training policy, the argument fails in light of the court's decision to grant summary judgment on that claim. Furthermore, even viewing the evidence in the light most favorable to OmniSource, no reasonable jury could find that Heat Wave's conduct on March 7, 2012, constituted fraud, malice, or willful and wanton conduct or that OmniSource otherwise has evidence to meet the requirements of section 1D-15(c). See, e.g., Martinez v. Nat'l Union Fire Ins. Co., 911 F. Supp. 2d 331, 339 (E.D.N.C. 2012). Thus, the court grants summary judgment to Heat Wave on OmniSource's request for punitive damages.

IV.

In sum, OmniSource's motion to strike [D.E. 28] is DENIED. The discovery period will be reopened solely to allow OmniSource to depose Heat Wave's expert, Hart C. Kerlin on his supplemental report. Within 30 days of Kerlin's supplemental deposition, OmniSource may submit a rebuttal expert report. If OmniSource chooses to retain a rebuttal expert, Heat Wave will then be allowed to depose that expert. Heat Wave's motion for summary judgment [D.E. 29] is GRANTED IN PART and DENIED IN PART. Only OmniSource's negligence claim survives. OmniSource's request for punitive damages is DISMISSED.

The court refers this case to United States Magistrate Judge Gates for a court-hosted settlement conference. Judge Gates will notify the parties how he wishes to proceed concerning the settlement conference, and the date on which it will be held.

SO ORDERED. This **29** day of May 2015.

JAMES C. DEVER III
Chief United States District Judge

Case 5:13-cv-00772-D   Document 39   Filed 05/29/15   Page 24 of 24